## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 29 2020, 9:32 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Carl Paul Lamb
Matthew Fox
Carl Lamb & Associates, P.C.
Bloomington, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Thomas Wininger,<br>*Appellant-Petitioner,*<br><br>v.<br><br>Carrie Lentz,<br>*Appellee-Respondent,* | December 29, 2020<br><br>Court of Appeals Case No.<br>20A-DC-305<br><br>Appeal from the Monroe Circuit Court<br><br>The Honorable Valeri Haughton, Judge<br><br>Trial Court Cause No.<br>53C02-1711-DC-521 |

**Robb, Judge.**

# Case Summary and Issues

[1] When Thomas Wininger ("Father") and Carrie Lentz ("Mother") ended their domestic relationship in 2017, they had disputes about the care and custody of their adopted child, A.W. Father filed a Verified Petition for Orders Regarding Custody, Parenting Time, and Child Support in late 2017. The parties' Interim Agreed Entry provided that Mother would have temporary primary physical custody. Following a final hearing conducted over several days in spring 2019, the trial court issued findings of fact and conclusions thereon at Father's request determining that Mother should have primary physical custody of A.W. with the parties to share joint legal custody. Father appeals the custody order, raising two issues for our review: 1) whether the trial court applied the correct legal standard for initial custody determinations; and 2) whether the trial court's findings support its judgment granting Mother primary physical custody. Concluding the trial court applied the correct standard but failed to make sufficient findings to support its judgment, we remand for entry of proper findings.

# Facts and Procedural History

[2] Mother and Father began dating in February 2014. In May 2014, Mother moved in with Father. Mother and Father each have three children from their previous marriages and each party's youngest child also lived in the household at that time. Mother owned and operated a daycare to which A.W.'s biological mother began bringing him in March 2015 when he was two months old. At

the biological mother's request, Mother began watching A.W. after the day care closed, "then it continued to taking him home with me and watching him in the evening, and then it continued to over night stays." Transcript of Evidence, Volume I at 127. A.W.'s biological mother eventually asked Mother to adopt A.W. Father was not very involved with A.W. for the first year or so after Mother started caring for him, but when A.W.'s mother inquired about adoption, Father was on board with the prospect. Mother and Father adopted A.W. in March of 2017. Around that same time, Father suggested that because the daycare was not profitable, Mother could work for him and spend more time with A.W. Mother closed her daycare at the end of March and began working as a property manager for Father's business, Wininger Real Estate, collecting rents.

[3] The parties separated in September 2017. Mother moved out of Father's house and took A.W. with her. She testified that for at least a month prior to this, Father had lost interest in her and A.W. and had stopped interacting with them. In October, Mother was fired from her job at Father's business due to alleged financial malfeasance. And in November, Father initiated this action by filing a Verified Petition for Orders Regarding Custody, Parenting Time, and Child Support seeking, among other things, joint legal and physical custody of A.W. Shortly thereafter, Mother and Father reached an interim agreement providing that Mother would have temporary physical custody of A.W. and Father would have parenting time on alternate weekends, Mondays overnight, and Wednesday evenings.

[4] In early 2019, A.W.'s behavior in school and at home led Mother to believe A.W. has Attention Deficit Hyperactivity Disorder ("ADHD") and she sought medical intervention. A.W.'s pediatrician initially prescribed medication, but Father was vehemently opposed: "He's a four year old boy. He's very active. . . . He's bright, energetic, why is that a problem?" Tr., Vol. II at 39. Father did not believe medication was indicated for a child of A.W.'s age but was willing to try behavioral therapy. Ultimately, A.W. was not placed on medication because his pediatrician re-evaluated her diagnosis and suggested the parties get a second opinion.

[5] The final hearing began on April 26, 2019, and continued over several days before concluding on June 21, 2019. At the time of the final hearing, Mother was working at the Monroe County Community School Corporation Early Learning Center and living at her parents' home. Since leaving Father's home and business, she had been evicted from two residences and terminated from two jobs. Mother's parents also have a home in Florida, so part of the year, it was just Mother, A.W., and frequently Mother's youngest child residing in the home. Father has lived in the same home for twenty-five years, including at the time A.W. was adopted, and has had his own business since he was twenty years old. Father carries insurance on A.W. and pays for his daycare.

[6] Testimony at the hearing revealed that after the parties separated, Mother began dating Samuel Barrow and Father began dating Jodi Key. Barrow and Key were married to each other in 2016-17. Key testified that while they were married, Barrow used alcohol nightly and was physically and mentally abusive

to her. Mother began seeing Barrow in January 2018, but except for a brief time when Mother and A.W. stayed at Barrow's home before she moved into her parents' house, Barrow was not around A.W. very often – "maybe, once every couple of weeks or once a month, if that." Tr., Vol. I at 153. "[Barrow] has no part and has never had a part in raising [A.W.]." *Id.*, Vol. II at 233. Although Father was concerned about A.W. being around Barrow because he believed Barrow to be violent based on Key's experience with him, Mother testified that Barrow never exhibited an abusive attitude toward A.W. or her. And by the time of the final day of the hearing, Mother and Barrow were no longer dating, although they were still friends.

[7]     Father and Key began dating in October 2017. They now live together, and Key participates in taking care of A.W. when Father has parenting time. But Key testified that if she were not in the picture, nothing about Father's ability to care for A.W. would change:

> [Father] has [A.W.'s] schedule down[. H]e knows how to take care of [A.W.], brush his teeth, read a book to him at night. Get him in the bathtub, . . . teach him stuff[,] . . . make sure his car seat [is] safely . . . in his car. Things that most men don't really think about, like [Father] does. He's raised his three boys. A lot by himself, he knows how to take care of [A.W.].

Tr., Vol. I at 18. Key believed it was in A.W.'s best interests for Father to have physical custody so that A.W. could have the kind of life his biological mother wanted for him: "A life, opportunity. To his fullest potential. Love. Stability. A family." *Id.* at 29-30.

Father described A.W. as "very bright, very inquisitive, very charismatic" and said he "needs to be challenged" and he hopes to help A.W. find his direction. Tr., Vol. II at 48-49. Father described Mother's form of discipline as yelling at A.W., but he "chose not to be involved in that." *Id*. at 41. Instead, when Father has to discipline A.W., he will "[t]ell him no. Put him in time out. Take things away from him. And if he is endangering himself, or someone else, corporal punishment." *Id.* If he were to be granted primary custody, Father said, "I could take him to school every day. I could pick him up from school every day. . . . Be with him [in] the evenings. Wake up with him. I look forward to it." *Id.* at 57.

Mother was concerned that A.W. was not disciplined at Father's house and was not appropriately supervised while there. When A.W. returns from parenting time with Father, "he just doesn't mind. He doesn't listen. He jumps on the furniture. . . . He runs from you. . . . [W]hen he comes back, you can tell, he has had no structure. He's had no discipline. He's a completely different child." *Id.* at 182. Mother was requesting primary custody because with her,

> he has structure. He has love. He has a big family that he's very, very close to. . . . I'm the only mother he's ever known. I'm the only one that's raised him. . . . I want the best for him and I want him to grow up . . . knowing right from wrong.

*Id.* at 202.  Mother noted that A.W. had "always been taken care of and he always will [be].  He's always had a clean, safe home and I have always been stable."  *Id.* at 195.

[10]  Mother's sister, Michelle Carmichael, testified that Mother is a "very good mother."  *Id.* at 112.  Carmichael observed Mother display love and affection for A.W. before ever adopting him and believed Mother would have adopted him on her own.  Carmichael believed Mother would be the better primary custodian for A.W. because of

> the relationships that she has with her children, with her family, the support system that she has, the things that she has to offer [A.W.] growing up and through the years to me is so much more [than Father can].  The love that she has and the desire to keep him safe and healthy and do the right things.

*Id.* at 132.

[11]  The trial court issued Findings of Fact and Conclusions of Law on January 10, 2020, determining the parties would share joint legal custody of A.W., with Mother to have primary physical custody and the "ultimate decision-making authority if a dispute arises."  Appealed Order at 17.  Father was awarded parenting time according to the Indiana Parenting Time Guidelines.  Father now appeals.

# Discussion and Decision

# I. Standard of Review

[12] Mother did not submit an appellee's brief. When an appellee does not file a brief, we do not need to develop an argument for her, and we apply a less stringent standard of review. *In re Guardianship of R.M.M.*, 901 N.E.2d 586, 588 (Ind. Ct. App. 2009). We may reverse the trial court if the appellant is able to establish prima facie error, which is error at first sight, on first appearance, or on the face of it. *Id.* Where an appellant is unable to meet that burden, we will affirm. *Howard v. Daugherty*, 915 N.E.2d 998, 1000 (Ind. Ct. App. 2009). The appellee's failure to submit a brief, however, does not relieve us of our obligation to correctly apply the law to the facts in the record in order to determine whether reversal is required. *Khaja v. Khan*, 902 N.E.2d 857, 868 (Ind. Ct. App. 2009).

[13] The trial court entered findings of fact and conclusions of law at Father's request. When reviewing such findings, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then whether the findings support the judgment. *Tompa v. Tompa*, 867 N.E.2d 158, 163 (Ind. Ct. App. 2007). We will not set aside the findings or judgment unless they are clearly erroneous, and we will give due regard to the opportunity of the trial court to judge the credibility of the witnesses. Ind. Trial Rule 52(A). "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Yanoff v. Muncy*, 688 N.E.2d 1259, 1262 (Ind. 1997). "A judgment is clearly erroneous when it is unsupported by the findings of fact and the conclusions relying on those

findings." *TMC Transp., Inc. v. Maslanka*, 744 N.E.2d 1052, 1055 (Ind. Ct. App. 2001), *trans. denied*. Moreover, "[a] judgment is clearly erroneous if it applies the wrong legal standard to properly found facts." *Yanoff*, 688 N.E.2d at 1262.

"In conjunction with the Trial Rule 52 standard, there is a longstanding policy that appellate courts should defer to the determination of trial courts in family law matters." *D.G. v. S.G.*, 82 N.E.3d 342, 348 (Ind. Ct. App. 2017), *trans. denied*. Our supreme court has stated:

> Appellate deference to the determinations of our trial court judges, especially in domestic relations matters, is warranted because of their unique, direct interactions with the parties face-to-face, often over an extended period of time. Thus enabled to assess credibility and character through both factual testimony and intuitive discernment, our trial judges are in a superior position to ascertain information and apply common sense, particularly in the determination of the best interests of the involved children.

*Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). It is not enough on appeal that the evidence might support some other conclusion; rather, the evidence must positively require the result sought by the appellant. *D.C. v. J.A.C.*, 977 N.E.2d 951, 957 (Ind. 2012). Accordingly, we will not substitute our own judgment if any evidence or legitimate inferences support the trial court's judgment. *Id*.

## II. Child Custody

Husband challenges the trial court's physical custody determination. Determinations regarding child custody fall within the trial court's sound

discretion. *Hamilton v. Hamilton*, 103 N.E.3d 690, 694 (Ind. Ct. App. 2018),

*trans. denied*. In an initial custody determination, both parents are presumed

equally entitled to custody. *Id*. The trial court "shall determine custody and

enter a custody order in accordance with the best interests of the child" by

considering all relevant factors, including:

> (1) The age and sex of the child.
> (2) The wishes of the child's parent or parents.
> (3) The wishes of the child, with more consideration given to the
> child's wishes if the child is at least fourteen (14) years of age.
> (4) The interaction and interrelationship of the child with:
>> (A) the child's parent or parents;
>> (B) the child's sibling; and
>> (C) any other person who may significantly affect the
>> child's best interests.
> (5) The child's adjustment to the child's:
>> (A) home;
>> (B) school; and
>> (C) community.
> (6) The mental and physical health of all individuals involved.
> (7) Evidence of a pattern of domestic or family violence by either
> parent.
> (8) Evidence that the child has been cared for by a de facto
> custodian, and if the evidence is sufficient, the court shall
> consider the factors described in section 8.5(b) of this chapter.

Ind. Code § 31-17-2-8. The trial court's consideration of the best interests of the

child is not limited to those factors explicitly listed in the statute. *Russell v.*

*Russell*, 682 N.E.2d 513, 515 (Ind. 1997). Further, when "a trial court is making

an initial custody determination, it is required to consider all evidence from the

time of [the] child's birth in determining the custody arrangement that would be

in the best interest of [the] child." *In re Paternity of M.W.*, 949 N.E.2d 839, 843 (Ind. Ct. App. 2011).

[16] In deference to the trial court's proximity to the issues, we do not reweigh the evidence or determine the credibility of witnesses. *Hughes v. Rogusta*, 830 N.E.2d 898, 902 (Ind. Ct. App. 2005). Instead, we consider the evidence most favorable to the judgment, with all reasonable inferences drawn in favor of the judgment. *Id.* We review the trial court's custody determination only for an abuse of discretion. *Hamilton*, 103 N.E.3d at 695.

## A. Custody Standard

[17] Father first contends the trial court wrongly applied the standard for custody *modifications* rather than the standard for initial custody determinations. The rules and standards to be applied by the trial court differ for an initial custody order versus a custody modification order. When making an *initial* custody determination, there is no presumption in favor of either parent and the trial court determines what custody arrangement is in the best interests of the child. Ind. Code § 31-17-2-8. When making a custody *modification* decision, a more stringent standard applies and the parent seeking modification bears the burden of showing the existing custody order should be changed. *Hughes*, 830 N.E.2d at 900; Ind. Code § 31-17-2-21(a).

[18] We agree with Father that the parties' interim agreement for Mother to have custody of A.W. during these proceedings was a provisional order only and that the order now being appealed was the first court determination regarding

custody. *See* Tr., Vol. I at 4 (Father's counsel noting at outset of hearing, and trial court agreeing, that there was a temporary custody determination via interim agreed entry in 2017 and "today is for the full custody determination"). "[P]rovisional orders are temporary orders that suffice until a full evidentiary hearing can be held." *Klotz v. Klotz*, 747 N.E.2d 1187, 1191 (Ind. Ct. App. 2001). Therefore, the trial court was making an initial custody determination and that standard applies.

[19] In the trial court's conclusions of law, the court quotes the Indiana Code section 31-17-2-8 factors, cites case law stating that the court is not limited to consideration of those factors in making a best interests determination and that it has discretion in weighing the evidence relevant to each factor as well as weighing the factors against each other, states that it "has considered each of the above quoted statutory factors[,]" and concludes that "the best interests of the child supports a finding that the Mother shall have primary physical custody of [A.W.]." Appealed Order at 15.

[20] Father contends that in reaching this conclusion, the trial court did not apply the initial determination standard because the order cites several cases that were decided in the custody modification context. Indeed, of the six cases the trial court cites in its conclusions pertaining to custody, five were decided in the context of a modification of child custody. *See* Appealed Order at 13-15. Although the trial court could have been more precise in the case law it cited, we do not believe citation to modification cases necessarily means the trial court applied the wrong standard.

[21] The trial court appropriately quoted the factors in Indiana Code section 31-17-2-8 as those primarily guiding its determination. The court also properly noted that it was not limited to considering only those factors, as the statute itself charges the court to consider "all relevant factors." Ind. Code § 31-17-2-8; *see* Appealed Order at 13 (citing *Russell*, 682 N.E.2d at 515). The trial court did *not* cite Indiana Code section 31-17-2-21(a) (custody modification standard) and did not mention "modification" or a "substantial change" in the section 8 factors in rendering its decision. The only language that could conceivably refer to the modification standard is the quote from *Fields v. Fields* that "permanence and stability are considered best for the welfare and happiness of the child." Appealed Order at 15. Although that may be a universal truth, the context in which that language appears is that *"[i]n subsequent hearings to modify custody*, the burden is on the petitioner to demonstrate that the existing custody order is unreasonable because permanence and stability are considered best for the welfare and happiness of the child." *Fields*, 749 N.E.2d 100, 108 (Ind. Ct. App. 2001) (emphasis added), *trans. denied*. Nonetheless, the trial court's order does not indicate that the fact that Mother had temporary primary physical custody of A.W. during these proceedings factored into its decision or that it placed a greater burden on Father to prove that arrangement was unreasonable. Accordingly, we cannot say the trial court erred in the standard it applied to determining custody in this case.

# B. Custody Determination

Father also contends that even if the trial court applied the correct standard, the findings are insufficient to support the judgment. Specifically, Father contends that many of the "findings" are mere recitations of witness testimony and that the majority of the remaining findings "suggest [Father] was more capable of providing for [A.W.'s] best interests." Brief of Appellant at 29.

The purpose of Trial Rule 52(A) is "to provide the parties and the reviewing court with the theory upon which the trial judge decided the case in order that the right of review for error may be effectively preserved." *In re Paternity of S.A.M.*, 85 N.E.3d 879, 885 (Ind. Ct. App. 2017). As we have previously explained:

> Findings of fact are a mechanism by which a trial court completes its function of weighing the evidence and judging witnesses' credibility. A satisfactory finding of fact is a simple, straightforward statement of what happened. A court . . . does not find something to be a fact by merely reciting that a witness testified to X, Y, or Z. Rather, the trier of fact must find that what the witness testified to is the fact. As such, where a trial court's findings are merely recitations of a witness' testimony, they cannot be construed as true factual determinations. We treat the trial court's inclusion of these findings as mere surplusage rather than harmful error. However, where the trial court has adopted the witness' testimony, such a finding may be considered a finding of fact.

*Pitcavage v. Pitcavage*, 11 N.E.3d 547, 553 (Ind. Ct. App. 2014) (quotations and citations omitted). "A finding of fact must indicate, not what someone said is

true, but what is determined to be true, for that is the trier of fact's duty." *Moore v. Ind. Family & Soc. Servs. Admin.*, 682 N.E.2d 545, 547 (Ind. Ct. App. 1997).

[24] Here, a great number of the trial court's 104 "Findings of Fact" are merely undisputed background information; the procedural history of the case, including the terms of the interim order; a recitation or summary of witness testimony; and descriptions of evidence admitted. The findings are laid out to describe, from beginning to end, what happened on each of the four days of the hearing. For example, the findings include:

> 16) Day one (1) of the parties' Final Hearing commenced on April 26, 2019.
>
> 17) The Court admitted and published [Father's] Exhibit "1", which was [Mother's] deposition transcript.
>
> 18) Father's first witness called was Jodi Key . . . .
>
> * * *
>
> 40) The second day of the Final Hearing was on May 9, 2019.
>
> 41) Prior to the presentation of evidence at the May 9th hearing, the Court indicated that it was going to accept [certain] testimony from the April 26th hearing . . . .
>
> 42) [Father] called [Mother] as his first witness at the May 9th Final Hearing.

Appealed Order at 4, 6. Many of the findings acknowledge a conflict in the evidence without resolving the conflict. *See, e.g., id.* at 5 (finding 38 stating Key's daughter "disputed [Mother's] contention that [A.W.] runs wild without boundaries while in [Father's] care"); and at 6 (finding 48 stating Mother "denied that Mr. Barrow was abusive"). Others merely state the parties' contentions or concerns, again without stating what the trial court determined to be true. *See, e.g., id.* at 10 (finding 84 stating that Father "expressed concern for Mother's lack of stability and questioned her ability to financially provide for [A.W.]"). Twenty-eight of the findings contain the phrase "[witness] testified" or "[witness] stated," and even where the findings do not so begin, most are essentially just a re-statement of the testimony given by each witness with no indication the trial court had adopted that testimony as fact. Most importantly, however, the trial court's findings do not clearly indicate the theory for its custody decision.

[25] Excluding the insufficient findings and undisputed background and procedural information, the remaining findings and conclusions pertaining to the trial court's custody determination are not sufficient to support the trial court's judgment. The age and sex of the child and the wishes of the child's parents are clear from the order. And the trial court did find that "[n]either party suffers from any disability that would undermine his/her ability to provide for [A.W.'s] safety and wellbeing," thus presumably commenting on their mental and physical health. Appealed Order at 9; *see* Ind. Code § 31-17-2-8(6). However, there are no findings by the court that could feasibly be said to

comment upon the relationship of A.W. with Mother and Father, with each of his siblings, or with his extended family or the significant others in his parents' lives.[1] There are no findings that reflect A.W.'s adjustment to the parties' homes or to his school.[2] And despite noting testimony about possible domestic violence perpetrated by Mother's most recent boyfriend, the trial court made no findings about whether such abuse occurred, and if so, whether it occurred in A.W.'s presence or otherwise affected him.

[26] Father requested that the trial court make special findings of fact and conclusions of law under Indiana Trial Rule 52(A). Therefore, the trial court's findings were required to "contain all facts necessary for recovery by a party in whose favor conclusions of law are found." *Bowman v. Bowman*, 686 N.E.2d 921, 925 (Ind. Ct. App. 1997). In other words, they were required to contain a statement of the ultimate facts from which the trial court made its custody

---

[1] For example, with respect to A.W.'s relationship with the parties, the trial court's finding include: "[Mother] testified that [Father] loves [A.W.], and that he plays, and interacts with [him]" and "[Mother] stated that [A.W.] enjoys spending time with [Father] and that he is a good financial provider[.]" Appealed Order at 7 (findings 51 and 52). The trial court's findings also include that Mother's sister "stated that [Mother] is an excellent parent." *Id.* at 9 (finding 69). With respect to A.W.'s relationship with his six siblings, the trial court found that "Ms. Key testified that [Father's twenty-six-year-old son] Colton and [A.W.] . . . interact well with each other[,]" *id.* at 4 (finding 23), and that "[Mother's] daughter Allyson . . . and Allyson's boyfriend . . . stay at [Mother's] home on a regular basis[,]" *id.* at 6 (finding 49). And with respect to A.W.'s relationship with Father's live-in girlfriend, the trial court's findings include that "Ms. Key testified that [A.W.] warmed up to her, especially after they went to Florida together on a family vacation in December 2018." *Id.* at 5 (finding 29). None of these "findings" shed light on what the trial court determined this testimony meant in relation to the section 8 factors.

[2] As above, the trial court's "findings" that a) "Ms. Key testified that [A.W.] has his own bedroom at Father's" and "[Mother] lives at her parents' home, in Bloomington, Indiana . . . since October 2018[,]" Appealed Order at 5-6 (Findings 32 and 43), and b) "[A.W.] attends daycare/preschool at Children's Village," *id.* at 5 (Finding 34), shed no light on the trial court's determination of the import of this testimony on A.W.'s adjustment to the parties' homes or his school.

determination. *Id.* Simply regurgitating the evidence without making credibility determinations or weighing conflicting evidence and then stating "the Court has considered each of the [section 8] factors" is insufficient when special findings have been requested. Appealed Order at 15; *cf. Russell*, 682 N.E.2d at 515, 515 n.2 (noting that although the trial court must consider all relevant factors in making its custody determination, it is not required to make specific findings *unless* a party so requests in writing). Simply put, the trial court's findings need to *illustrate* and not just state that the section 8 factors have been considered.

[27] We cannot discern from the trial court's findings whether it based its custody order on proper statutory considerations.[3] We therefore remand in order for the trial court to enter appropriate and adequate findings based on evidence from the final hearing to support its judgment. *See Hazelett v. Hazelett*, 119 N.E.3d 153, 159 (Ind. Ct. App. 2019) (remanding a dissolution case to the trial court with instructions to enter proper findings of fact and conclusions thereon to support the trial court's custody determination because the trial court's original

---

[3] Although Father contends the "evidence and Findings of Fact before the Trial Court clearly indicate that [he] . . . should have been awarded primary custody[,]" Br. of Appellant at 36, we cannot agree. First, because Father requested special findings, we are not at liberty to look beyond the trial court's findings and independently consider whether the *evidence* supports the judgment as we would be if the trial court had entered findings sua sponte; instead, we are limited to determining whether the trial court's findings support the judgment. Second, the findings as a whole are insufficient regarding the section 8 factors in favor of either parent, as Father himself acknowledges. *See id.* at 35-36 ("Nothing in the Trial Court's [order] indicate[s] that there was proper assessment of facts relevant to [the] best interests' inquiry in the context of an initial physical custody determination.").

findings were not sufficient and did not reflect what the trial court found to be true).

# Conclusion

[28] Although the trial court applied the appropriate standard for an initial custody determination, the trial court failed to make sufficient findings to support its custody decision. We therefore remand to the trial court for further findings and retain jurisdiction. The judgment of the trial court shall be filed with this court within thirty days from the issuance of this opinion.

[29] Remanded for the entry of proper findings of fact and conclusions of law.

Crone, J., and Brown, J., concur.